# 18-2811(L)

## 18-2825(CON), 18-2867(CON), 18-2878(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—against—

DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN,
CHRISTOPHER WORRALL,

*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

### APPELLANTS' JOINT BRIEF ON REMAND

---

DAVID ESSEKS
EUGENE INGOGLIA
ALEXANDER BUSSEY
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300

DONALD B. VERRILLI, JR.
ELAINE J. GOLDENBERG
JONATHAN S. MELTZER
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
 Suite 500E
Washington, DC 20001
(202) 220-1100

*Attorneys for Defendant-Appellant Robert Olan*
*(Counsel continued on following page)*

DANIEL M. SULLIVAN
JAMES M. MCGUIRE
HOLWELL SHUSTER &
 GOLDBERG LLP
425 Lexington Avenue
New York, New York 10017
(646) 837-5151

– and –

STEPHEN FISHBEIN
JOHN A. NATHANSON
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Attorneys for Defendant-Appellant*
*   Christopher Worrall*

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
ERIC S. OLNEY
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

– and –

DANI R. JAMES
KRAMER LEVIN NAFTALIS &
 FRANKEL LLP
1177 Sixth Avenue
New York, New York 10036
(212) 715-9100

*Attorneys for Defendant-Appellant*
*   Theodore Huber*

COLLEEN P. CASSIDY
BARRY D. LEIWANT
FEDERAL DEFENDERS OF
 NEW YORK, INC.
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700

*Attorneys for Defendant-Appellant*
*   David Blaszczak*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

ARGUMENT ........................................................................................................... 8

    I.     Under *Kelly*, Regulatory Information With No Economic Value To The Government Cannot Constitute Government Property ................................................................................................ 8

    II.    *Kelly*'s Holding Requires Reversal Of All Counts Of Conviction ...................................................................................... 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Bond v. United States*,
    572 U.S. 844 (2014) .......................................................................21

*Carpenter v. United States*,
    484 U.S. 19 (1987) ........................................................................14

*Cleveland v. United States*,
    531 U.S. 12 (2000) ...................................................................*passim*

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) ..............................................................*passim*

*Marinello v. United States*,
    138 S. Ct. 1101 (2018) ..................................................................22

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016) .............................................................20, 22

*McNally v. United States*,
    483 U.S. 350 (1987) ...................................................................1, 11

*Neder v. United States*,
    527 U.S. 1 (1999) ...........................................................................23

*Pasquantino v. United States*,
    544 U.S. 349 (2005) ......................................................................16

*Skilling v. United States*,
    561 U.S. 358 (2010) ...................................................................3, 18

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ........................................................23

*United States v. Gatto*,
    2021 WL 137250 (2d Cir. Jan. 15, 2021) .....................................13

*United States v. Girard*,
601 F.2d 69 (2d Cir. 1979) ...................................................................24

*Unites States v. Hung*,
629 F.2d 908 (4th Cir. 1980) ...............................................................22

*Yates v. United States*,
574 U.S. 528 (2015)........................................................................22, 23

**FEDERAL STATUTES**

18 U.S.C. § 371 ...................................................................................5, 25

18 U.S.C. § 641 ...............................................................................*passim*

18 U.S.C. § 793 ........................................................................................22

18 U.S.C. § 794 ........................................................................................22

18 U.S.C. § 798 ........................................................................................22

18 U.S.C. § 1030(a)(1) ............................................................................22

18 U.S.C. § 1343 .............................................................................*passim*

18 U.S.C. § 1346 ..................................................................................2, 19

18 U.S.C. § 1348 ........................................................................3, 5, 6, 23

18 U.S.C. § 1349 ...................................................................................5, 25

18 U.S.C. § 1905 ......................................................................................22

50 U.S.C. § 783(a) ...................................................................................22

**OTHER AUTHORITIES**

Peter Baker & Eileen Sullivan, *U.S. Virus Plan Anticipates 18-Month
Pandemic and Widespread Shortages*, New York Times (Mar. 17,
2020), https://www.nytimes.com/2020/03/17/us/politics/trump-
coronavirus-plan.html ...........................................................................20

Maddie Bender, *She Blew the Whistle on Pathogens That Escaped From a Government Lab. Now She's Being Fired*, VICE (Feb. 27, 2020), https://www.vice.com/en_us/article/bvg5xm/whistleblower-biosafety-government-lab-pathogen-leak-washington ........................................20

Matthias Gafni & Joe Garofoli, *Captain of aircraft carrier with growing coronavirus outbreak pleads for help from Navy*, S.F. Chronicle (Mar. 31, 2020), https://www.sfchronicle.com/coronavirus/article/aircraft-carrier-captain-outbreak-ship-navy-help-15169227.php ................................................20

*Medicaid Chief's Consulting Expenses Revealed*, Politico (Sept. 10, 2020), https://www.politico.com/news/2020/09/10/seema-verma-medicaid-expenses-411539 ...................................................................................4

Brette M. Tannenbaum, Note, *Reframing the Right: Using Theories of Intangible Property to Target Honest Services Fraud after Skilling*, 112 Colum. L. Rev. 359 (2012) ...........................................................19

Eugene Volokh, *More on "Journalists Might Be Felons for Publishing Leaked Governmental 'Predecisional Information,'"* Reason (Jan. 5, 2021), https://reason.com/volokh/2021/01/05/more-on-journalists-might-be-felons-for-publishing-leaked-governmental-predecisional-information................................................................................................20

iv

# INTRODUCTION

The Supreme Court's unanimous decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), emphatically affirms that interference with the government's regulatory interests—even interference as egregious and unethical as "Bridgegate"—cannot be prosecuted as federal fraud or conversion. Building on *Cleveland v. United States*, 531 U.S. 12 (2000), and *McNally v. United States*, 483 U.S. 350 (1987), the Court emphasized in *Kelly* that federal property-crime statutes criminalize only fraudulent schemes that deprive the government of its money or its property. They do not apply when the defendants' actions "'implicate[] the government's role as sovereign'" rather than "its role 'as property holder.'" *Kelly*, 140 S. Ct. at 1572. And that is true even if the defendants' actions impose incidental economic costs on the government. Property fraud occurs only if taking the government's money or property is the "object" of the scheme. *Id.* at 1573.

The question here is therefore "whether the defendants committed property fraud" as *Kelly* defines it, *id*. at 1568, or instead interfered with the government's regulatory interests in a manner that the federal property-crime statutes do not cover, *see id*. The answer is obvious. The government's sole argument at trial was that the unauthorized pre-decisional disclosure of Centers for Medicare and Medicaid Services ("CMS") reimbursement information might spur additional lobbying and disrupt the rate-setting process. Those interests are purely regulatory in character.

They have nothing to do with the government's "role 'as property holder.'"  *Id*. at 1572.

Indeed, CMS's right to control decisions about what rates to set and when to disclose them is no less regulatory than the analogous "intangible rights of allocation, exclusion, and control" at issue in *Kelly*'s highway lane alignments.  *Id*.  And, just as in *Kelly*, the additional cost to the government (if any) resulting from the defendants' actions here was plainly an incidental effect; imposing such costs was not the "object" of the defendants' actions.  *Kelly* thus dictates that the defendants' convictions must be overturned—for precisely the reasons set forth in Judge Kearse's dissent from the prior panel opinion.  Dissent 6 (government's "right to control" disclosure of CMS data is a regulatory interest, not a property interest).

As *Kelly* emphasized, federal property-crime statutes are not all-purpose tools that federal prosecutors may wield to enforce "integrity" or their own views of what "standards of disclosure" should apply to government employees and those who may act in concert with them.  140 S. Ct. at 1574.  Yet that is precisely what the prosecutors in this case did.  They did not charge defendants with violating 18 U.S.C. § 1346, the "honest services" statute that Congress enacted to protect the integrity of the government's regulatory process—presumably because they could not prove that defendant Worrall (the government employee who allegedly disclosed the reimbursement data) received a bribe or a kickback as that statute requires.  *See*

2

*Skilling v. United States*, 561 U.S. 358, 402, 408-09 (2010). Instead, the government misused the federal property-crime statutes in exactly the way that *Kelly* forbids.

All of that is bad enough, but there are additional powerful reasons why the government's misuse of those statutes in this case must be rejected. Among other serious problems, accepting the government's arguments would criminalize the actions of whistleblowers, journalists who communicate with them, and media outlets that publish those journalists' reports, thus raising extremely serious First Amendment concerns; would enable federal authorities to interfere with the workings of state and local government; and would usurp Congress's judgment by supplanting various federal statutes specifically directed to confidential government information.

Before the Supreme Court, the government *agreed* that this Court's prior decision must be reconsidered in light of *Kelly*, and made no effort to argue that the convictions at issue could be affirmed notwithstanding *Kelly*. That is understandable, because the analysis set forth in *Kelly* removes any doubt that defendants' convictions under Sections 641, 1343, and 1348 must be reversed. And, as Judge Kearse observed, when those convictions are wiped away, all of the remaining convictions must fall.[1]

---

[1] Because this Court's judgment is vacated, the panel may rule for defendants on any ground in their prior briefing in this Court. Defendants respectfully advance and preserve all their prior arguments, including as to issues not addressed here. *See* Huber Br. 20-62; Olan Br. 19-61; Pet. 24-35 and Pet. Reply 7-11, S. Ct. No. 20-306

3

## BACKGROUND

1.   CMS establishes the rates at which Medicare and Medicaid reimburse healthcare providers for services.[2]  Each year, the agency proposes changes to the rates and then promulgates new regulations.  JA474.  Both before and after CMS issues its proposed rules, the agency sometimes shares information about its proposals with interested parties, including in private conversations.  *E.g.*, JA477-78, 493, 515-16, 523-28, 849, 2602.[3]

In 2012, defendant Blaszczak, a consultant, predicted to Deerfield analyst Jordan Fogel that CMS would propose cutting reimbursement rates for certain radiation-oncology treatments "in half"—consistent with public information published by a medical association.  JA1985.  Fogel relayed Blaszczak's prediction by email to a large group at Deerfield, including defendants Huber and Olan.  *Id.*

---

(challenging novel holding that proof of "personal benefit" is not required to establish insider-trading fraud under Title 18 fraud statutes); Worrall Br. 18-43 (arguing evidence insufficient to support conviction); Blaszczak Br. 44-73. Defendants also note the amicus briefs previously filed here and in the Supreme Court.    *See*    https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-306.html.   Defendants are prepared to address the arguments in their prior submissions at oral argument or in further briefing, as the panel sees fit.

[2] The full factual background is set forth in defendants' previous briefs.

[3] *See also Medicaid Chief's Consulting Expenses Revealed*, Politico (Sept. 10, 2020) (recent CMS head "frequently shared market-sensitive proposals" outside agency "before announcing the information publicly—in one case, about three months before the agency's proposed rules were publicly issued").  The table of authorities sets forth URLs for this and all other articles cited in this brief.

They treated Blaszczak's prediction not as definitive "inside" information, but as legitimate intelligence that they considered as part of their overall assessment. Deerfield later shorted shares of a radiation-device manufacturer. JA2574. The government alleged that Blaszczak based his prediction on confidential information he received from defendant Worrall, a CMS employee. JA1086.

The proposed CMS rule issued as planned—and when it did, Blaszczak's prediction was revealed to be largely incorrect. CMS proposed a lower reimbursement rate for the relevant treatments, but applied it only to certain facilities that are not responsible for most of those treatments. Blaszczak had predicted an across-the-board reduction. JA578-79, 659-68, 2567-70.

2. The government charged defendants with violations of Section 10(b) and Rule 10b-5 (Title 15 fraud provisions), as the government typically does when prosecuting alleged insider-trading fraud. But the government also charged wire fraud (18 U.S.C. § 1343); conversion of government property (18 U.S.C. § 641); Title 18 securities fraud (18 U.S.C. § 1348); and conspiracy (18 U.S.C. §§ 371, 1349). To support those additional charges, the government contended that confidential information about proposed regulations should be treated as government property for purposes of the wire-fraud, conversion, and Title 18 securities-fraud statutes.

The jury acquitted all defendants of all Title 15 charges—undoubtedly because no evidence established personal benefit to any tipper, much less "tippee" knowledge

5

of any such benefit—but convicted them of wire fraud and conversion. The jury also convicted Blaszczak, Huber, and Olan of Title 18 securities fraud and of conspiracy.

3. a. On December 30, 2019, a divided panel of this Court affirmed. The panel majority held that confidential information regarding agency deliberations over a proposed regulation is "property" under Sections 1343 and 1348 and a "thing of value" under Section 641. The majority stated that "CMS's right to exclude the public from accessing" regulatory information "implicates the government's role as property holder," particularly given that the government "invests . . . resources into generating and maintaining . . . confidentiality." Op. 22-23. The majority also rejected defendants' other arguments.

Judge Kearse dissented. She concluded that a defendant who uses information about "the substance and timing" of "a planned CMS regulation" does not obtain government "property" or convert a "thing of value" to the government. Dissent 3-4. As Judge Kearse explained, the Supreme Court's decision in *Cleveland* established that "property" does not encompass a regulatory "right[] of . . . control," and—"[l]ike the gaming licenses in question in *Cleveland* . . . —the predecisional CMS information has no economic impact on the government." *Id.* at 6-7 (citing *Cleveland*, 531 U.S. at 23). She reasoned that "CMS is not a business" that might sell confidential information; "it is a regulatory agency" that "adopts its preferred planned regulation" regardless of whether information about those plans becomes

public. *Id.* at 3-4. Accordingly, she concluded, confidentiality does not "enhance[] the value of the information" to CMS, and disclosure does not "deprive[]" the agency "of anything that could be considered property." *Id.* at 5-6. On that basis, Judge Kearse would have reversed all of defendants' convictions. *Id.* at 7-10.

b. This Court denied petitions for rehearing, and defendants Blaszczak, Huber, and Olan moved to stay the mandate.[4] The Supreme Court then issued its unanimous decision in *Kelly*, which set aside convictions for rerouting traffic on the George Washington Bridge. The Supreme Court reaffirmed *Cleveland*'s holding that "a scheme to alter . . . a regulatory choice is not one to appropriate the government's property." 140 S. Ct. at 1572. The Court explained that "allocating lanes as between different groups of drivers" on the bridge is a "run-of-the-mine exercise of *regulatory* power" to allocate and control resources. *Id.* at 1572-73 (emphasis added). And the Court emphasized that, although the scheme required "the time and labor of Port Authority employees," that sort of "incidental byproduct" is not enough to show "property fraud"—because "[e]very regulatory decision" involves some employee labor. *Id.* at 1573-74.

Defendants submitted a 28(j) letter stating that *Kelly* required a stay of the mandate. ECF No. 335, Dkt. 18-2811. In response, the government argued that this Court need not stay the mandate because "the facts of this case are far removed from

---

[4] Worrall opted to serve his sentence and was later released to home confinement.

the facts of *Kelly*." ECF No. 343, Dkt. 18-2811. This Court granted the stay.

Defendants then sought Supreme Court review and contended (*inter alia*) that this Court's decision could not be reconciled with *Kelly*. This time, however, the government made no effort to defend the decision or to distinguish *Kelly*, as it had when it opposed defendants' stay request. Instead, after obtaining multiple extensions, the government submitted a one-paragraph memorandum stating that *Kelly*'s holding that "a scheme to alter . . . a regulatory choice is not one to appropriate the government's property" required this Court to reconsider its prior decision. No. 20-306, at 2 (U.S. Nov. 24, 2020) (quoting *Kelly*). The government's position before the Supreme Court is telling; if there were any sound basis for distinguishing *Kelly*, surely the government would have advanced it.

On January 11, 2021, the Supreme Court granted the petitions, vacated this Court's judgment, and remanded for further consideration in light of *Kelly*. Dkt. Nos. 20-306 & 20-5649 (U.S. Jan. 11, 2021).

## ARGUMENT

## I. Under *Kelly*, Regulatory Information With No Economic Value To The Government Cannot Constitute Government Property

When this Court first considered defendants' appeal, the panel majority and Judge Kearse reached starkly different conclusions about whether obtaining access to government information about a proposed regulation deprives the government of property within the meaning of the relevant federal criminal statutes. Judge Kearse

8

concluded that, under *Cleveland*, the government has no economic interest in pre-decisional regulatory information and that "premature disclosure" of such information therefore does not "take[] any property from CMS or the government." Dissent 7; *see Cleveland*, 531 U.S. at 20-22, 24 (addressing scheme to obtain government licenses and holding that if the government's "core concern is *regulatory*" rather than "economic," the object of that concern "is not 'property' in the government regulator's hands"). The majority, by contrast, attributed little significance to whether the government acted in its "role as sovereign" exercising regulatory powers. *Cleveland*, 531 U.S. at 23-24. Confining *Cleveland* essentially to its facts, the majority stated that the "right to exclude" simpliciter is the "most significant" factor in defining government property, regardless of whether that "right" protects any government economic interest. Op. 22.

*Kelly* resolves all doubt about which conclusion is correct. The unanimous Court unambiguously drew a legally determinative dividing line between the government's regulatory and economic interests, explaining that the government's exercise of the "rights of allocation, exclusion, and control" to advance a regulatory objective "do[es] 'not create'" a government "property interest." *Kelly*, 140 S. Ct. at 1572-73 (quoting *Cleveland*, 531 U.S. at 23). Just as a choice about who has access to a lane cannot support a property-fraud conviction, neither can a choice about who has access to information about a reimbursement-rate proposal.

9

1. In *Kelly*, the Supreme Court considered a scheme to snarl traffic in Fort Lee—and thereby harm its mayor—by limiting the number of access lanes to the George Washington Bridge exclusively available to motorists coming from Fort Lee. To implement the plan, officials had to pay for extra employee time. *See* 140 S. Ct. at 1573-74. The government charged the defendants with federal crimes that "target fraudulent schemes for obtaining property," including wire fraud. *Id.* at 1568.

The Supreme Court overturned the defendants' convictions because, although they had engaged in wrongdoing, they had not committed "*property* fraud" under federal law. *Id.* (emphasis added). Relying on *Cleveland*, the Court explained that the government's "intangible rights of allocation, exclusion, and control" of access to government resources involve a "quintessential exercise of regulatory power," not a government property right. *Id.* at 1572-73 (quoting *Cleveland*, 531 U.S. at 23). The Court therefore concluded that the *Kelly* defendants had not taken government property by "alter[ing] a regulatory decision about the toll plaza's use." *Id.* at 1573. As the Court observed, the realignment of toll lanes did not "commandeer" the physical lanes; the government's ability to use them was undiminished. *Id.* at 1573. Rather, the government interest at stake was a regulatory one: "which drivers had a 'license' to use" certain lanes. *Id.* at 1568, 1573.

The Supreme Court also explained that even though defendants' conduct had caused the government to pay for unnecessary employee labor related to the lane

10

realignment, that economic harm was not sufficient to support a property-fraud conviction.  The Court recognized that a "scheme to usurp a public employee's paid time" by diverting it to serve private ends gives rise to a straightforward "economic loss," and therefore takes the government's property.  *Id.* at 1572-73.  But a conviction under the property-fraud statutes "cannot stand," the Court explained, if economic loss to the victim "is only an incidental byproduct of the scheme."  *Id.* at 1573.  The *Kelly* defendants' scheme involved just such an incidental economic effect, because they had not sought to obtain employees' services; they had sought only to "alter a regulation" about bridge access.  *Id.* at 1573-74; *see id.* at 1574 ("Every regulatory decision . . . requires the use of some employee labor.").

The Supreme Court emphasized that "[t]o rule otherwise would undercut this Court's oft-repeated instruction" that federal prosecutors may not use property-fraud statutes to "set[] standards of disclosure and good government for local and state officials."  *Id.* at 1574 (quoting *McNally*, 483 U.S. at 360).  The Court acknowledged that the *Kelly* defendants had engaged in bad acts, but stressed that "[t]he property fraud statutes do not countenance" reaching beyond "schemes for obtaining property" and allowing federal authorities to "enforce" their own "view of[] integrity" in regulatory decisionmaking.  *Id.*  The text of Congress's enactments cannot support such a "sweeping expansion of federal criminal jurisdiction."  *Id.*

2.  The reasoning in *Kelly* controls this case:  it is simply not plausible to

11

describe the conduct at issue here as a "scheme[] for obtaining property" from the government. 140 S. Ct. at 1574. Indeed, the reasoning of *Kelly* closely tracks that of Judge Kearse's dissent.

*Kelly* draws a categorical distinction between actions that interfere with the government's "exercise of regulatory power," which cannot be prosecuted under the property-crime statutes, and actions that "appropriate the government's property," which can. *Id.* at 1572 (citing *Cleveland*, 531 U.S. at 203). That distinction depends solely on the nature of the government interest, not the specific factual context in which a case arises or whether the goal of an alleged scheme is to force a government regulatory decision or to change or undermine one.

It is difficult to imagine something more "quintessential[ly] . . . regulatory," *id.* at 1572-73, than predictive information about what regulation the government may propose. The government has no "traditional" economic interest in maintaining the confidentiality of such information, *Cleveland*, 531 U.S. at 24, which the government does not sell or otherwise exploit for economic gain. And because the government can—and did—continue to use the information and to issue exactly the regulation it planned regardless of the public's advance knowledge, *see* Dissent 4, disclosure of that information does not deprive the government of anything of economic value to it. In short, the government's decision about how to allocate access to that information, and when to release it, no more constitutes government

12

property than a decision about who should be able to drive in a particular lane of a public road. *See Kelly*, 140 S. Ct. at 1572.

That conclusion is confirmed by closer examination of the way in which CMS operated. The agency selectively shared otherwise confidential information with interested parties, as many agencies do, in order to inform the rulemaking process. *See* p. 4 & n.3, *supra*. The government's core allegation is that CMS had the regulatory power to determine who had a "'license' to use" the information at issue, *Kelly*, 140 S. Ct. at 1573 (citation omitted), and that defendants usurped that regulatory prerogative when they learned of information in a context that the agency had not authorized. *Id.* Thus, "what [defendants] did" was (at most) to "alter a regulatory decision" about confidentiality. *Id.*; *see also United States v. Gatto*, 2021 WL 137250, at *6 n.4 (2d Cir. Jan. 15, 2021). Such a "run-of-the-mine exercise of regulatory power cannot count as the taking of property." *Kelly*, 140 S. Ct. at 1573.

Moreover, the government has never identified any economic interest that the government holds in the information at issue or in its confidentiality. At trial, the government contended that unauthorized disclosure of information might make the rate-setting process more difficult by causing increased lobbying and forcing the agency to restrict sharing of information. *See* JA467, 504, 766-67, 840. That is an expression of the government's interest in how the agency functions; it has nothing to do with the government's "role 'as property holder.'" *Kelly*, 140 S. Ct. at 1572.

13

Relying on the same authority that undergirds *Kelly*, Judge Kearse came to the same conclusion in her dissent from the prior panel opinion. She emphasized that the alleged disclosure here, at most, affected the government's regulatory right to control the information's "*secre[cy]*." Dissent 5-6 (emphasis added). As she observed, "regardless of whether information as to the substance or timing of a planned regulation remains confidential as CMS prefers or is disclosed to unauthorized listeners, CMS adopts its preferred planned regulation and . . . can do so in accordance with its own timetable." *Id.* at 4. Thus, disclosure of the information has no relevant "economic impact" on the agency. *Id.* at 7.

In addition, Judge Kearse correctly distinguished the Supreme Court's decision in *Carpenter v. United States*, 484 U.S. 19 (1987), which preceded *Kelly* (and *Cleveland*) and concluded that "[c]onfidential *business* information has long been recognized as property." *Id.* at 26 (emphasis added). As Judge Kearse explained, *Carpenter* addressed a business's self-evident *economic* interest in *selling* information—a long-recognized species of property interest that a government regulator entirely lacks. Dissent 3; *see id.* at 4 ("Unlike the information that was planned for publication by the news publisher victim in *Carpenter*, information is not CMS's 'stock in trade.' CMS does not seek buyers or subscribers; it is not in a competition; it is an agency of the government that regulates the conduct of others." (quoting *Carpenter*, 484 U.S. at 26) (citation omitted)).

14

Tellingly, *Cleveland* distinguished *Carpenter* on that basis. *See* 531 U.S. at 19, 23. And although *Kelly* does not discuss *Carpenter*, it relies on *Cleveland* in the same way that Judge Kearse did. Indeed, if anything the argument for finding a property interest in *Kelly* was stronger than it is here. Physical lanes on a bridge have long been recognized as property; a private business's economic interest in selling access to lanes on a privately owned bridge is likely also a form of property. But none of that stopped the Court from concluding that the only government interest at stake in *Kelly* was a regulatory one. The government continued to have access to the bridge lanes despite their reallocation, *see* 140 S. Ct. at 1572-73, and the government had no interest at all in *selling* exclusive use of the lanes to members of the public. Here, the information at issue has the same use and value to the government after its disclosure as it did before, and the government does not sell information about its proposed regulations. The government merely regulates access to that information in keeping with its views about the way that CMS should operate for the public's benefit—an interest that is exclusively regulatory. If the government interest in *Kelly* was not a property interest, then surely neither is the government's interest here.

3. *Kelly* also directly contradicts the key rationales of the prior panel decision.

First, the panel majority stated that the "most significant" factor in creating a property right is CMS's "right to exclude" others from accessing the information— irrespective of whether exercising that right preserves something of economic value

15

to the government. Op. 22. As noted, *Kelly* says the exact opposite. That decision explains in unequivocal terms that the government's exercise of its "regulatory rights of 'allocation, exclusion, and control'" does "'*not* create a property interest.'" *Kelly*, 140 S. Ct. at 1572-73 (quoting *Cleveland*, 531 U.S. at 23) (emphasis added). *Kelly* thus contradicts the very core of the panel majority's analysis.

Second, the panel majority concluded that CMS had suffered an "economic" loss because it "invests time and resources" in maintaining confidentiality of information and has an "economic interest in making efficient use of its limited time and resources." Op. 23. But *Kelly* again directly rejects those conclusions. *Kelly* holds that to sustain a property-based criminal conviction, the government's "property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" 140 S. Ct. at 1573 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). Here, obtaining CMS employees' "time and resources" cannot credibly be described as the *object* of the charged scheme.

*Kelly* likewise refutes any suggestion that actions that simply make government less economically efficient constitute a taking of government property. State authorities doubtless invest substantial "time and resources" into ensuring proper lane alignment and traffic flow on the George Washington Bridge, and the diversion of employee time to the realignment scheme surely "impede[d] the agency's efficient functioning." Op. 23. But that did not affect the result in *Kelly*:

16

the Supreme Court concluded that the government lacked an economic interest in a "regulatory decision about the toll plaza's use."  140 S. Ct. at 1573.

Finally, the panel majority stated that *Cleveland* was effectively limited to its facts.  The majority said that *Cleveland* had little effect on the "existing legal landscape," that "courts have consistently rejected attempts" to apply *Cleveland* to new factual scenarios, and that "*Cleveland*'s 'particular selection of factors' did not establish 'rigid criteria for defining property but instead . . . provid[ed]" only "permissible considerations."  Op. 21 (citation omitted).  *Kelly*, which made *Cleveland* the centerpiece of its analysis, repudiates that crabbed understanding.  140 S. Ct. at 1572-73.  To suggest after *Kelly* that *Cleveland*'s holding is merely a "permissible consideration[]," Op. 21, as opposed to a controlling rule, is untenable.

4.  *Kelly*'s admonition against expanding the property-crime statutes beyond "traditional concepts of property," *Cleveland*, 531 U.S. at 24, is also fully applicable to this case and confirms that reversal is required.

In its prior opinion, the panel majority dismissed defendants' arguments about the consequences of an "unprecedented expansion of federal criminal law" as mere "enforcement policy concerns."  Op. 54-55.  But *Kelly* is crystal clear that preventing that expansion is not just a "policy concern."  Rather, it is a legal imperative that goes to the heart of the separation of powers, federalism, and due process.  As their text plainly demonstrates, the statutes here are property-crime statutes—they criminalize

17

schemes to defraud the government of "money," "property," or "thing[s] of value." They do not broadly criminalize disclosure of confidential government information or police the "honest services" of government employees. By applying them to the conduct at issue in this case—which has nothing to do with the government's property—the government engaged in precisely the "ballooning of federal power" and "'sweeping expansion of federal criminal jurisdiction'" that the Supreme Court forbade in *Kelly*. 140 S. Ct. at 1574 (quoting *Cleveland*, 531 U.S. at 24).

First, upholding defendants' convictions would eviscerate the limits the Supreme Court has placed on "honest-services" fraud prosecutions, which seek to punish employees who deprive their employers of the "intangible right" to honest conduct. *Skilling*, 561 U.S. at 399-402. As *Kelly* stated, the Supreme Court has carefully limited honest-services prosecutions to those in which the government can prove a bribe or kickback. 140 S. Ct. at 1571-72 (citing *Skilling*, 561 U.S. at 405, 410). But, *Kelly* explained, expansion of the federal fraud statutes to encompass not only government property but also the government's exercise of regulatory power would erase that careful limitation. *See id.* at 1571-72, 1574. Such an expansion would give federal prosecutors the ability to punish any form of wrongdoing by government officials and any effort by private parties to induce such wrongdoing— and that would place the power to "'set[] standards of disclosure and good government'" entirely in federal prosecutors' hands. *Id.* at 1574.

18

The same concerns arise here. Under the approach taken by the prior panel decision, deprivations of honest services—even where no bribe or kickback is involved—could be charged as federal property crimes. *See* Brette M. Tannenbaum, Note, *Reframing the Right: Using Theories of Intangible Property to Target Honest Services Fraud after* Skilling, 112 Colum. L. Rev. 359, 363-64, 393-95 (2012). After all, faithless government employees often disclose confidential government information in the course of advancing their own personal interests, and they inevitably expend government "time and resources" in doing so. Op. 23.

Indeed, this case itself quite expressly involves an effort by federal prosecutors to set "standards of disclosure" for government agencies, *Kelly*, 140 S. Ct. at 1574, by deeming disclosure of any information that has been labeled confidential to be a theft of government property. The government did not charge anyone with committing honest-services fraud in violation of 18 U.S.C. § 1346. By charging under the federal property-crime statutes instead, the government avoided *Skilling*'s requirement of proving a bribe or kickback. Upholding the convictions thus would create exactly the "end-run" around limitations on honest-services fraud that the Supreme Court has just definitively disapproved. *Id*.

Second, upholding defendants' convictions would create a "sweeping expansion of federal criminal jurisdiction," *Kelly*, 140 S. Ct. at 1574, in an additional unprecedented way: it would criminalize a host of routine and beneficial acts that

19

reveal information about the inner workings of the government. If defendants'
convictions are based on a valid interpretation of the relevant statutes, then the
disclosure of confidential regulatory information by a whistleblower who reveals
government malfeasance, a journalist who reports that revelation, and a reformer who
publicizes it would constitute violations of those statutes as well—punishable by
*decades* in prison. *See*, *e.g.*, Eugene Volokh, *More on "Journalists Might Be Felons
for Publishing Leaked Governmental 'Predecisional Information,'"* Reason (Jan. 5,
2021). Such disclosures occur every day in Washington, D.C. and state capitals
across the country, and published stories based on such disclosures are commonplace.
*See, e.g.*, Peter Baker & Eileen Sullivan, *U.S. Virus Plan Anticipates 18-Month
Pandemic and Widespread Shortages*, New York Times (Mar. 17, 2020). They are
essential for keeping the government accountable to the people and shining light on
practices that harm the public, violate the law, or both. *See, e.g.*, Matthias Gafni &
Joe Garofoli, *Captain of aircraft carrier with growing coronavirus outbreak pleads
for help from Navy*, S.F. Chronicle (Mar. 31, 2020); Maddie Bender, *She Blew the
Whistle on Pathogens That Escaped From a Government Lab. Now She's Being
Fired*, VICE (Feb. 27, 2020). Criminalizing them raises grave First Amendment
concerns—a strong indication that the government's interpretation cannot be correct.
*See McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016) (federal criminal
statutes should not be read to authorize prosecutions raising "significant

constitutional concerns"); *Bond v. United States*, 572 U.S. 844, 866 (2014) (same).

Third, as *Kelly* strongly reinforces, an affirmance in this case would threaten federalism because it would impair the ability of States and localities to manage their own affairs. *See Kelly*, 140 S. Ct. at 1571, 1574. The prosecution's theory of property draws no distinction between confidential *federal* government information and confidential *state* and *local* government information—in the view of the United States, this Court should characterize all of that information as government property. Accepting that theory would transform a local police officer's disclosure of a body-camera video, or a staffer's discussion with a journalist about a governor's secret hiring criteria, into serious federal crimes. That would necessarily "subject to" federal prosecution "a wide range of conduct traditionally regulated by state and local authorities," thereby meaningfully destabilizing the "federal-state balance." *Cleveland*, 531 U.S. at 24-25 (citation omitted). Such an outcome cannot be reconciled with *Kelly*, which sounds an alarm about interpreting the federal property statutes so as to allow the United States to "use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking." 140 S. Ct. at 1574.

Finally, affirming the convictions here would negate calibrated federal statutes—many enacted well after the statutes at issue here—penalizing disclosure of confidential information. Those statutes impose penalties only as to disclosure of certain information by particular actors for particular purposes, often with limited

21

penalties.[5]  If the information at issue here (which was, after all, no more than rumor and half-truth about a proposed rule) constitutes government property, then federal fraud and conversion statutes would indiscriminately cover the same ground—and much more.  Moreover, the applicable statutory maximum would often be far more draconian.[6]  That would allow prosecutors to override Congress's judgments about whether and how to criminally punish disclosures of government information—a state of affairs that would, once again, put in prosecutors' hands the ability to enforce their own views of government integrity.  *See Kelly*, 140 S. Ct. at 1574; *see also Unites States v. Hung*, 629 F.2d 908, 927 & n.21 (4th Cir. 1980) (opinion of Winter, J.) ("permit[ting] § 641 to serve as a criminal prohibition against the merely willful unauthorized disclosure of any classified information" would "greatly disrupt th[at] network of carefully confined criminal prohibitions").

All of those consequences underscore the importance of heeding the Supreme Court's warning about government misuse of the fraud statutes and overbroad federal criminal liability more generally.  *See Kelly*, 140 S. Ct. at 1574; *see also*, *e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1106-09 (2018); *McDonnell*, 136 S. Ct. at 2372-73; *Yates v. United States*, 574 U.S. 528, 548-49 (2015).  After *Kelly*, the

---

[5] *See, e.g.*, 18 U.S.C. §§ 793, 794, 798, 1030(a)(1); 50 U.S.C. § 783(a).

[6] *Compare, e.g.*, 18 U.S.C. § 1905 (one-year maximum sentence under general statute criminalizing unauthorized disclosure by government employee), *with* 18 U.S.C. § 1343 (20-year maximum sentence).

Supreme Court's "instruction" is clear, 140 S. Ct. at 1574: an alleged scheme that relates to a government regulatory interest rather than a government economic interest cannot be punished as a federal property crime.

## II.    *Kelly*'s Holding Requires Reversal Of All Counts Of Conviction

All of defendants' convictions hinge on the existence of a government property interest. First, Sections 1343 and 1348 employ nearly identical language to proscribe schemes to defraud the government of property. *See* 18 U.S.C. § 1343 (fraudulent schemes for "obtaining money or property"); 18 U.S.C. § 1348 (fraudulent schemes "to obtain . . . any money or property"). It is settled law that statutory terms should be construed consistently across the federal criminal-fraud statutes, *see, e.g.*, *Neder v. United States*, 527 U.S. 1, 21 (1999), as the previous panel decision correctly acknowledged, Op. 18. For that reason, *Kelly*'s holding about the scope of "property" in Section 1343 applies with equal force to Section 1348. *See United States v. Coscia*, 866 F.3d 782, 799 (7th Cir. 2017) (statutes should be read the same way).

Second, the phrase "thing of value" in 18 U.S.C. § 641 cannot be construed to have a broader meaning than "property." The statutory text makes that clear: it refers to "thing of value" as "such property" and defines the term as something capable of having a monetary value. *Id.* Moreover, the provision's caption ("Public money, property or records") treats "thing of value" as "property." *See Yates*, 574 U.S. at 540 (captions "supply cues"). For all of the reasons that (in light of *Kelly*) defendants

23

did not obtain "property," they also did not convert a "thing of value." And all of the pernicious effects associated with an expansive reading of "property," *see* pp. 17-23, *supra*, would equally arise if defendants' convictions for conversion were upheld.

As Judge Kearse explained in her panel dissent, this Court's decision in *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979), which found Section 641 applicable to "records" containing the names of confidential DEA informants on the ground that the government "has a property interest" in them, *id.* at 69-71, does not change that conclusion. Dissent 5. That 1979 decision predates *Kelly* (and *Cleveland*) by decades. In light of *Kelly*'s subsequent clarification of the scope of government property interests, *Girard* does not remain good law.

But even if *Girard* were good law, it is readily distinguishable for the reason Judge Kearse identified: unlike in *Girard*, disclosure of confidential information here does not deprive the government of anything of value to it. Dissent 5. Once the identity of confidential informants is revealed, information about those informants no longer has any value to a law-enforcement agency. But the disclosure of pre-decisional information about a proposed regulation has no bearing on the value of that information to CMS or on CMS's ability to carry out its regulatory duties. CMS can, and here did, proceed to issue its proposed regulation without any change and without any loss of effectiveness. *See id.* (CMS may "carry out or deviate from its planned adoption of regulations even if its plans, and/or the information that affects"

24

them, "become public knowledge before CMS prefers that such disclosures occur").

Finally, as Judge Kearse concluded, if the substantive convictions fall, the conspiracy convictions fall with them. Blaszczak, Huber, and Olan were convicted of violating 18 U.S.C. § 1349 by conspiring to commit wire fraud and securities fraud (Count Two), and Blaszczak was convicted of violating 18 U.S.C. § 371 by conspiring to commit conversion (Count Twelve). Because the conduct of those defendants was not "prohibited by" the underlying substantive provisions (Sections 641, 1343, 1348), they "could not properly be convicted of conspiring to violate" those provisions. Dissent 8; *see Kelly*, 140 S. Ct. at 1571 n.1.

The Count One convictions (for conspiracy under 18 U.S.C. § 371 to convert property, commit securities fraud, and defraud the United States)—are equally invalid. As Judge Kearse explained, "[w]hen, as here, the jury has been presented with several bases for conviction, one or more of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction should be vacated." Dissent 9. The jury may have found only that Blaszczak, Huber, and Olan agreed to violate the conversion statute, even though that basis for conviction is legally invalid because their conduct "fails to come within the statutory definition of th[at] crime." *Id.* at 10 (citation omitted).

## CONCLUSION

Defendants' convictions should be reversed.

25

Dated: February 5, 2020

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Eric S. Olney
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

Dani R. James
KRAMER LEVIN NAFTALIS &
KRANKEL LLP
1177 Sixth Avenue
New York, New York 10036
(212) 715-9100

*Attorneys for Defendant-Appellant*
*Theodore Huber*

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Jonathan S. Meltzer
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
(202) 220-1100

David Esseks
Eugene Ingoglia
Alexander Bussey
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300

*Attorneys for Defendant-Appellant*
*Robert Olan*

/s/ Daniel M. Sullivan
Daniel M. Sullivan
James M. McGuire
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue
New York, New York 10017
(646) 837-5151

Stephen Fishbein
John A. Nathanson
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Attorneys for Defendant-Appellant*
*Christopher Worrall*

/s/ Colleen P. Cassidy
Colleen P. Cassidy
Barry D. Leiwant
FEDERAL DEFENDERS OF NEW
YORK, INC.
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700

*Attorneys for Defendant-Appellant*
*David Blaszczak*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT

1.     The undersigned counsel of record for Defendant-Appellant Robert Olan certifies that the foregoing brief complies with the Order of January 29, 2021 because it comprises 25 pages.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font of Times New Roman.

Dated:    February 5, 2021

<u>/s/ Donald B. Verrilli, Jr.</u>
Donald B. Verrilli, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 5, 2021, electronically filed the foregoing brief with the United States Court of Appeals for the Second Circuit using the CM/ECF system and that parties or their counsel of record are registered ECF filers and will be served by the CM/ECF system.

Dated:    February 5, 2021

                                       /s/ Donald B. Verrilli, Jr.
                                       Donald B. Verrilli, Jr.