# 18-2811(L)

**18-2825(CON),**
**18-2867(CON), 18-2878(CON)**

*To Be Argued By*:
WON S. SHIN

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### FOR THE SECOND CIRCUIT

### Docket Nos. 18-2811(L), 18-2825(CON), 18-2867(CON), 18-2878(CON)

◄►►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

DAVID BLASZCZAK, THEODORE HUBER,
ROBERT OLAN, CHRISTOPHER WORRALL,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF ON REMAND
## FOR THE UNITED STATES OF AMERICA

AUDREY STRAUSS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

IAN MCGINLEY,
JOSHUA A. NAFTALIS,
WON S. SHIN,
*Assistant United States Attorneys,*
*Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.  The Counts of Conviction . . . . . . . . . . . . . . .   3

    B.  This Court's Prior Decision . . . . . . . . . . . .   5

    C.  The Supreme Court's Remand in Light of
        *Kelly* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

ARGUMENT:

POINT I—The Property Fraud and Conversion
    Convictions Should Be Reversed . . . . . . . . . . .   7

POINT II—The Convictions on Count One and
    Count Seventeen Should Be Affirmed . . . . . . . .   9

    A.  The Section 371 Defraud-Clause Objects
        Remain Legally Valid . . . . . . . . . . . . . . . . .   10

    B.  The *Yates* Errors for Counts One and
        Seventeen Were Harmless Beyond a
        Reasonable Doubt . . . . . . . . . . . . . . . . . . . .   12

        1.  Applicable Law. . . . . . . . . . . . . . . . . . .   12

        2.  Discussion. . . . . . . . . . . . . . . . . . . . . . .   14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

ii

PAGE

## **TABLE OF AUTHORITIES**

*Cases*:

*Carpenter v. United States*,
    484 U.S. 19 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cleveland v. United States*,
    531 U.S. 12 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*Dirks v. SEC*,
    463 U.S. 646 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Griffin v. United States*,
    502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Haas v. Henkel*,
    216 U.S. 462 (1910) . . . . . . . . . . . 14, 15, 17, 20, 21

*Hammerschmidt v. United States*,
    265 U.S. 182 (1924) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hedgpeth v. Pulido*,
    555 U.S. 57 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Illinois ex rel. Madigan v. Telemarketing*
    *Associates, Inc.*,
    538 US 600 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) . . . . . . . . . . . . . . . 2, 6, 8, 11

*McNally v. United States*,
    483 U.S. 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Neder v. United States*,
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

PAGE

*Pasquantino v. United States,*
544 U.S. 349 (2005). . . . . . . . . . . . . . . . . . . . . . . . 7

*Skilling v. United States,*
561 U.S. 358 (2010). . . . . . . . . . . 10, 12, 13, 23, 24

*Tanner v. United States,*
483 U.S. 107 (1987). . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Atilla,*
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . 11, 24

*United States v. Ballistrea,*
101 F.3d 827 (2d Cir. 1996) . . . . . . . . . . . . . . . . 11

*United States v. Baroni,*
909 F.3d 550 (3d Cir. 2018) . . . . . . . . . . . . . . . . 11

*United States v. Blaszczak,*
947 F.3d 19 (2d Cir. 2019) . . . . . . . . . . . . . *passim*

*United States v. Coplan,*
703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . 11, 14, 24

*United States v. Coppola,*
671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . 13

*United States v. Desnoyers,*
637 F.3d 105 (2d Cir. 2011) . . . . . . . . . . . . . . . . 12

*United States v. Draper,*
553 F.3d 174 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 9

*United States v. Ferguson,*
676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . . . . 13

*United States v. Girard,*
601 F.2d 69 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . 5

iv

PAGE

*United States v. Gurary,*
860 F.2d 521 (2d Cir. 1988) . . . . . . . . . . . . . 20, 21

*United States v. Hertular,*
562 F.3d 433 (2d Cir. 2009) . . . . . . . . . . . . . . . . 9

*United States v. Nersesian,*
824 F.2d 1294 (2d Cir. 1987) . . . . . . . . . . . . . . 10

*United States v. Peltz,*
433 F.2d 48 (2d Cir. 1970) . . . . . . . . . . . . . *passim*

*United States v. Skilling,*
638 F.3d 480 (5th Cir. 2011) . . . . . . . . . . . . . . . 13

*United States v. Southland,*
760 F.2d 1366 (2d Cir. 1985) . . . . . . . . . . . . . . . 21

*Yates v. United States,*
354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . 10

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 9, 10

18 U.S.C. § 641 . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 6, 7

18 U.S.C. § 1348 . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 7

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 18-2811(L), 18-2825(CON), 18-2867(CON), 18-2878(CON)

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN, CHRISTOPHER WORRALL,

*Defendants-Appellants.*

---

## BRIEF ON REMAND
## FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

David Blaszczak, Theodore Huber, Robert Olan, and Christopher Worrall appeal from judgments of conviction entered on September 21 and 24, 2018 in the United States District Court for the Southern District of New York, following a five-week trial before the Honorable Lewis A. Kaplan, United States District Judge, and a jury.

On December 30, 2019, this Court affirmed the judgments. *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019). On April 10, 2020, this Court denied the

2

defendants' petitions for rehearing. Blaszczak, Huber, and Olan then moved to stay the mandate pending their filing of petitions for writs of certiorari in the Supreme Court. On May 7, 2020, while the stay motions were pending, the Supreme Court decided *Kelly v. United States*, 140 S. Ct. 1565 (2020). On July 14, 2020, this Court granted the stay motions.[1]

Blaszczak, Huber, and Olan subsequently filed petitions for writs of certiorari in the Supreme Court, which Worrall supported. At the request of the Acting Solicitor General, the Supreme Court granted the petitions, vacated this Court's judgment, and remanded the case for further consideration in light of *Kelly*.

The Government respectfully submits this brief to address the impact of *Kelly*. The brief was prepared in consultation with the Office of the Solicitor General to reflect the Department of Justice's post-*Kelly* position on the scope of "property" under 18 U.S.C. §§ 1343 and 1348 and a "thing of value" under 18 U.S.C. § 641, which this Office is constrained to follow.

———————

[1] Worrall did not move to stay the mandate. On January 9, 2020, Worrall asked the District Court to set a surrender date so that he could begin to serve his sentence. The District Court granted Worrall's request, and he began to serve his sentence on February 14, 2020. According to the Bureau of Prisons, on August 28, 2020, Worrall was placed in home confinement for the remainder of his prison term, and he is scheduled to be released on July 15, 2021. Blaszczak, Huber, and Olan remain on bail pending appeal.

3

**Background**[2]

## A.  The Counts of Conviction

Superseding Indictment S1 17 Cr. 357 (LAK) (the "Indictment") was filed on March 5, 2018, in 18 counts. The Indictment alleged that Worrall, who worked for the Centers for Medicare and Medicaid Services ("CMS"), improperly disclosed to his friend and former colleague Blaszczak, a "political intelligence" consultant, confidential information about upcoming changes to agency rules governing reimbursement rates, and that Blaszczak passed that information to employees of his hedge fund client Deerfield Management Company, L.P. ("Deerfield"), including Huber and Olan, for use in placing profitable trades.

Trial commenced on April 2, 2018, and ended on May 3, 2018, when the jury convicted each defendant on some counts and acquitted each on others. The counts of conviction are as follows:

––––––––––

[2]  "Tr." refers to the trial transcript; "GX" refers to a Government exhibit admitted at trial; "DX" refers to a defense exhibit admitted at trial; "[Defendant] Br." refers to the named defendant's initial brief on appeal; "A." refers to the appendix filed with defendants' initial briefs; "SA" refers to the supplemental appendix filed with the Government's initial brief; and "Remand Br." refers to defendants' joint brief on remand. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and alterations.

4

Blaszczak, Huber, and Olan were convicted of Count One, which charged conspiracy to convert United States property, to commit securities fraud, and to defraud the United States, in violation of 18 U.S.C. § 371; and Count Two, which charged conspiracy to commit wire fraud and securities fraud, in violation of 18 U.S.C. § 1349.

Counts Three through Ten charged substantive offenses related to unauthorized disclosure of, and trading based on, confidential CMS information concerning a proposed radiation oncology rule. All four defendants were convicted of Count Three, which charged conversion of United States property, in violation of 18 U.S.C. §§ 641 and 2; and Count Nine, which charged wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Blaszczak, Huber, and Olan were convicted of Count Ten, which charged securities fraud, in violation of 18 U.S.C. §§ 1348 and 2.

Counts Thirteen through Sixteen charged substantive offenses arising from Worrall's provision to Blaszczak of confidential CMS information relating to a proposed kidney dialysis rule. Blaszczak was convicted of Count Thirteen, which charged conversion of United States property, in violation of 18 U.S.C. §§ 641 and 2; Count Fifteen, which charged wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and Count Sixteen, which charged securities fraud, in violation of 18 U.S.C. §§ 1348 and 2.[3]

---

[3]   Securities fraud in violation of 18 U.S.C. § 1348 is hereinafter referred to as "Title 18 securities fraud."

5

Counts Seventeen and Eighteen charged offenses related to Blaszczak's provision of confidential CMS information, including information about an impending home health care reimbursement rate decision, to a cooperating witness, Christopher Plaford, a trader at another hedge fund, Visium Asset Management, L.P. ("Visium"). Blaszczak was convicted of Count Seventeen, which charged conspiracy to convert United States property and to defraud the United States, in violation of 18 U.S.C. § 371; and Count Eighteen, which charged conversion of United States property, in violation of 18 U.S.C. §§ 641 and 2.

## B.  This Court's Prior Decision

On appeal, the defendants argued, among other things, that "the confidential CMS information at issue is not 'property' in the hands of CMS for purposes of the wire fraud and Title 18 securities fraud statutes." *Blaszczak*, 947 F.3d at 30. Relying principally on *Carpenter v. United States*, 484 U.S. 19 (1987), and distinguishing *Cleveland v. United States*, 531 U.S. 12 (2000), this Court held that, "in general, confidential government information may constitute government 'property' for purposes of 18 U.S.C. §§ 1343 and 1348, and that here, there was sufficient evidence to establish that the CMS information at issue was 'property' in the hands of CMS." *Blaszczak*, 947 F.3d at 34. The defendants also argued that "confidential information is not a '*thing* of value' within the meaning of the conversion statute." *Id.* at 39. Relying on *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979), this Court held that

6

"confidential information can itself be a 'thing of value' under Section 641." *Blaszczak*, 947 F.3d at 39.[4]

## C. The Supreme Court's Remand in Light of *Kelly*

In *Kelly*, the Supreme Court held that a "scheme to reallocate the [George Washington] Bridge's access lanes" did not constitute property fraud under 18 U.S.C. §§ 1343 and 666(a)(1)(A). 140 S. Ct. at 1574. Relying heavily on *Cleveland*, the Court concluded that the object of the fraud—the "lane realignment" by the Port Authority—was an "exercise of regulatory power" rather than "the taking of property." *Id.* at 1572-73. The Court also held that, while "[a] government's right to its employees' time and labor . . . can undergird a property fraud prosecution" because "the cost of those employees' services would qualify as an economic loss to" the government, that property "must be an object of the fraud" rather than merely "an incidental byproduct of the scheme." *Id.* at 1573.

On September 4, 2020, Huber, Olan, and Blaszczak filed petitions for writs of certiorari. Relying

───────────

[4] This Court also held that the rule of *Dirks v. SEC*, 463 U.S. 646 (1983), under which "an insider may not be convicted of Title 15 securities fraud unless the government proves that he breached a duty of trust and confidence by disclosing material, nonpublic information in exchange for a 'personal benefit,'" does not apply to the wire fraud and Title 18 securities fraud statutes. *Blaszczak*, 947 F.3d at 34-35, 37 (quoting *Dirks*, 463 U.S. at 663).

7

principally on *Cleveland* and *Kelly*, they argued that information about a proposed government regulation is not "property" under 18 U.S.C. §§ 1343 and 1348 and is not a "thing of value" under 18 U.S.C. § 641. Worrall filed a memorandum in support of the petitions.

The Acting Solicitor General requested that the Supreme Court grant the petitions, vacate this Court's decision, and remand the case for further consideration in light of *Kelly*. The Supreme Court granted that request, vacating this Court's judgment and remanding the case for further consideration in light of *Kelly*. *Olan v. United States*, —S. Ct.—, 2021 WL 78042 (Jan. 11, 2021); *Blaszczak v. United States*, —S. Ct.—, 2021 WL 78043 (Jan. 11, 2021).

## A R G U M E N T

### POINT I

### The Property Fraud and Conversion Convictions Should Be Reversed

In light of the Supreme Court's holding in *Kelly*, it is now the position of the Department of Justice that in a case involving confidential government information, that information typically must have economic value in the hands of the relevant government entity to constitute "property" for purposes of 18 U.S.C. §§ 1343 and 1348. *Compare Cleveland*, 531 U.S. at 15, 22 (license is not "property in the hands of the [government] victim," and the government was not deprived of any "economic" value), *with Pasquantino v. United States*, 544 U.S. 349, 355, 357 (2005) (right to

8

uncollected taxes is "something of value" to the government and represents "a straightforward 'economic' interest"). A related, though not necessarily identical, analysis applies when determining what confidential information is a "thing of value" under 18 U.S.C. § 641. The Department has determined that the confidential information at issue in this case does not constitute "property" or a "thing of value" under the relevant statutes after *Kelly*. To be sure, this Court recognized that "CMS *does* have an economic interest in its confidential predecisional information" because the agency "invests time and resources into generating and maintaining the confidentiality of" that information, and leaks affect the "efficient use of its limited time and resources." *Blaszczak*, 947 F.3d at 33. But in the Department's view, shaped by *Kelly*, the CMS employee time at issue in this case did not constitute "an object of the fraud," and thus the associated "labor costs could not sustain the conviction[s]" here. *Kelly*, 140 S. Ct. at 1573.

Accordingly, this Office is constrained to confess error at the direction of the Solicitor General's Office and request that this Court set aside the defendants' convictions on Count Two (conspiracy to commit wire fraud and Title 18 securities fraud), Count Three (conversion of United States property), Count Nine (wire fraud), Count Ten (Title 18 securities fraud), Count Thirteen (conversion of United States property), Count Fifteen (wire fraud), Count Sixteen (Title 18 securities fraud), and Count Eighteen (conversion of United States property). Because the defendants contested the meaning of "property" and a "thing of value" in challenges to the sufficiency of the evidence, the

9

appropriate remedy is to reverse rather than vacate the convictions on these counts. *United States v. Hertular*, 562 F.3d 433, 435 (2d Cir. 2009); *United States v. Draper*, 553 F.3d 174, 183 (2d Cir. 2009).[5]

The defendants' convictions on Count One and Count Seventeen should be affirmed for the reasons set forth in Point II.

## POINT II

### The Convictions on Count One and Count Seventeen Should Be Affirmed

Blaszczak, Huber, and Olan were convicted of Count One, a conspiracy with three objects: (1) to convert United States property, in violation of 18 U.S.C. § 641; (2) to commit securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and (3) to defraud the United States, in violation of 18 U.S.C. § 371. Blaszczak was also convicted of Count Seventeen, a conspiracy with two objects: (1) to convert United States property, in violation of 18 U.S.C. § 641; and (2) to defraud the United States, in violation of 18 U.S.C. § 371.

---

[5] The defendants' petitions for writs of certiorari also challenged this Court's holding regarding the applicability of the *Dirks* personal-benefit test to the Title 18 property-fraud charges. In light of the confession of error as to those counts, this Court need not address this issue on remand.

10

In light of the confession of error, *see* Point I, the Government is constrained to concede that the § 641 objects are legally invalid. But the § 371 defraud-clause objects were not affected by *Kelly* and remain legally valid. Because the jury returned a general verdict, the presence of both legally invalid and legally valid objects gives rise to error under *Yates v. United States*, 354 U.S. 298 (1957). Such an error is, however, "subject to harmless-error analysis." *Skilling v. United States*, 561 U.S. 358, 414 (2010). The jury was presented with overwhelming evidence that Blaszczak, Huber, and Olan conspired to defraud the United States in connection with the Deerfield Scheme (Count One) and that Blaszczak conspired to defraud the United States in connection with the Visium Scheme (Count Seventeen). Thus, the *Yates* errors were harmless beyond a reasonable doubt, and the convictions on Counts One and Seventeen should be affirmed.

## A. The Section 371 Defraud-Clause Objects Remain Legally Valid

The "defraud clause" of the general conspiracy statute prohibits conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. Because the provision "is designed to protect the integrity of the United States and its agencies," it is "well established" that the defraud clause "not only reaches schemes which deprive the government of money or property" but also "embraces any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government . . . by deceit, craft, or trickery, or by means that are dishonest." *United States v.*

11

*Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987); *see also McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (defraud clause "reaches conspiracies other than those directed at property interests"); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud . . . ."); *United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996) (defraud clause is interpreted "more broadly" than the mail and wire fraud statutes). This Court has repeatedly rejected claims that the defraud clause is limited to conspiracies to deprive the United States of "property rights." *United States v. Atilla*, 966 F.3d 118, 129 (2d Cir. 2020) (quoting *United States v. Coplan*, 703 F.3d 46, 59 (2d Cir. 2012)).

*Kelly* did not consider this body of law. The defendants in *Kelly* were not charged with conspiracy to defraud the United States. *See* 140 S. Ct. at 1571 (describing counts); *United States v. Baroni*, 909 F.3d 550, 556 (3d Cir. 2018) (same). Furthermore, while the Supreme Court discussed the scope of "property fraud" in *Kelly*, the Court did not question its precedents recognizing that the defraud clause "reaches conspiracies other than those directed at property interests." *McNally*, 483 U.S. at 358 n.8; *see also Tanner v. United States*, 483 U.S. 107, 128 (1987) ("[W]e have stated repeatedly that the fraud covered by the [defraud clause] reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government."). Indeed, the opinion in *Kelly* does not mention the defraud clause at all. *Kelly* therefore does not disturb the Supreme Court's and

12

this Court's defraud-clause jurisprudence, and the defendants do not contend otherwise.

Thus, conspiracy to defraud the United States under § 371 remains a legally valid conspiratorial object.

## B. The *Yates* Errors for Counts One and Seventeen Were Harmless Beyond a Reasonable Doubt

### 1. Applicable Law

In light of the confession of error, *see* Point I, the Government is constrained to concede that the § 641 object of each conspiracy was legally invalid in that it "fail[ed] to come within the statutory definition of the crime." *Griffin v. United States*, 502 U.S. 46, 59 (1991) (discussing *Yates* errors); *see also United States v. Desnoyers*, 637 F.3d 105, 109-10 (2d Cir. 2011) (discussing legal defects under *Yates* as distinguished from factual defects under *Griffin*). Because the jury returned a general verdict, these conspiracy convictions accordingly are "flawed" under *Yates*. *Skilling*, 561 U.S. at 414. The defendants argue that Count One should be set aside because "[t]he jury may have found only that Blaszczak, Huber, and Olan agreed to violate the conversion statute, even though that basis for conviction is legally invalid." (Remand Br. 25).[6]

---

[6] The defendants do not argue on remand that Blaszczak's conviction on Count Seventeen should be set aside for the same reason. (*See* Remand Br. 25).

13

The Supreme Court has made clear, however, that instructing a jury on multiple theories of guilt, one of which is legally invalid, is not structural error. *Hedgpeth v. Pulido*, 555 U.S. 57, 60-62 (2008). A *Yates* error "does not necessarily require reversal of the conspiracy conviction" at issue, because "errors of the *Yates* variety are subject to harmless-error analysis" on direct appeal. *Skilling*, 561 U.S. at 414 & n.46 (remanding for harmless-error review). Thus, the conspiracy counts may be affirmed if, after "conduct[ing] a thorough examination of the record," this Court "conclude[s] beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 19 (1999); *see also United States v. Coppola*, 671 F.3d 220, 237-38 (2d Cir. 2012) (rejecting *Yates* claim where "jury necessarily would have had to" make finding under valid theory); *United States v. Ferguson*, 676 F.3d 260, 277 (2d Cir. 2011) (defendants not prejudiced by instructional error if "jury would have necessarily found the defendants guilty on one of the properly instructed theories of liability"). In *Skilling* itself, for example, the Fifth Circuit applied the *Neder* harmless-error standard on remand and, in light of the "overwhelming evidence" that the defendant conspired to commit a legally valid conspiratorial object, "conclude[d] beyond a reasonable doubt that the verdict would have been the same absent the alternative-theory error." *United States v. Skilling*, 638 F.3d 480, 483-84 (5th Cir. 2011).

─────────

Blaszczak did, however, make such an argument in his initial brief on appeal. (Blaszczak Br. 66).

14

Here, the *Yates* errors for Counts One and Seventeen were harmless in light of the valid § 371 defraud-clause object in each count. Based on the evidence presented at trial, this Court can conclude beyond a reasonable doubt that a jury would have returned guilty verdicts on Counts One and Seventeen even if it had been instructed solely on the defraud-clause objects.

### 2. Discussion

To prove a conspiracy to defraud the United States under § 371, the Government must show "(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *Coplan*, 703 F.3d at 61. In their initial briefs, Blaszczak, Huber, and Olan disputed only the second and third elements of the defraud-clause objects. (Blaszczak Br. 64-66; Huber Br. 57-61; Olan Br. 49-51). Their arguments have no merit, as the evidence at trial established beyond a reasonable doubt that they agreed to obstruct a lawful function of the Government by deceitful or dishonest means.

The leading precedents defining the contours of the defraud clause as applied to schemes to obtain confidential government information are *Haas v. Henkel*, 216 U.S. 462 (1910), and *United States v. Peltz*, 433 F.2d 48 (2d Cir. 1970). In *Haas*, one of the "seminal Supreme Court cases" regarding conspiracies to defraud the United States, *Coplan*, 703 F.3d at 60, one count alleged that the defendants, who included a

15

statistician employed by the Department of Agriculture's Bureau of Statistics,

> conspired to defraud the United States by secretly obtaining information from [the statistician], which he should acquire in his official character as associate statistician, and should, in violation of his official duty, give out secretly to his co-conspirators, as to the probable contents of certain official cotton crop reports in advance of the time when these reports were to be promulgated according to law.

*Haas*, 216 U.S. at 477. The purpose of the conspiracy was "to obtain such information from [the statistician] in advance of general publicity" and "to use such information in speculating upon the cotton market." *Id.* at 478. The defendants argued that these allegations would not support a charge of conspiracy to defraud the United States because they did not allege a pecuniary loss to the government. *Id.* at 479. The Supreme Court rejected that argument, noting that "practices of this kind would deprive these reports of most of their value to the public, and degrade the department in general estimation, and that there would be a real financial loss." *Id.* The Court underscored that "it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result," and it was sufficient that the conspiracy would "defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation." *Id.* at 479-80.

16

In *Peltz*, the defendant, an attorney, conspired with an employee of the SEC "to obtain confidential inside information about matters under consideration by the Commission and use such information for private profit" by selling stock in a company before an SEC enforcement action against that company was announced. 433 F.2d at 49-50. The defendant argued that there was no conspiracy to defraud the United States because "the Government suffered no pecuniary harm" and "there was no intention to prevent [the SEC from] taking the [enforcement] action contemplated." *Id.* at 51. Rejecting these arguments, this Court held that "[a]n agreement whereby a federal employee will act to promote private benefit in breach of his duty . . . comes within the statute if the proper functioning of the Government is significantly affected thereby." *Id.* at 52. As the Court further explained, "[p]ublic confidence essential to the effective functioning of government would be seriously impaired by any arrangement that would enable a few individuals to profit from advance knowledge of governmental action." *Id.* Thus, on the facts of that case, "the high repute and effective functioning of the SEC . . . would be significantly compromised by arrangements whereby an individual could obtain information about its impending action from one of its employees and profit from having such knowledge before this became available to the public generally." *Id.* The Court further recognized that "[s]imilar considerations would apply" to other schemes to "obtain advance information" regarding various government actions, including "rate decisions" and other decisions "having implications for the stock market." *Id.* at 52 n.4.

17

Thus, under *Haas* and *Peltz*, the element of obstructing a lawful government function may be demonstrated by proof that the conspiracy "depriv[ed] [the agency] of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation," *Haas*, 216 U.S. at 479-80, via an "arrangement that would enable a few individuals to profit from advance knowledge of governmental action," *Peltz*, 433 F.2d at 52. As this Court has explained, such a conspiracy obstructs a lawful government function by "seriously impair[ing]" the "[p]ublic confidence essential to the effective functioning of" an agency. *Id.* The evidence at trial overwhelmingly established conspiracies on all fours with *Haas* and *Peltz*.

First, as several CMS witnesses testified at trial, CMS kept its "predecisional" information—internal consideration of proposed and final rules, including specific reimbursement rates—strictly confidential until public announcement. (A. 465, 701, 764-66 (Tr. 198, 1540, 1924-30)). The announcements generally were made at around 4:15 p.m., after the stock market closed, because they could move the stock prices of publicly traded companies whose businesses were affected, and "there was a concern that the financial markets needed time to digest the information." (A. 465, 765, 840 (Tr. 199, 1927, 2379)). CMS did not share predecisional information about proposed or final rules with Congress or its staff. (A. 767 (Tr. 1935-36)). In addition, all CMS employees were trained annually on CMS's confidentiality policy. (A. 465, 766 (Tr. 198-99, 1929)). CMS's Employee Nondisclosure Policy and applicable ethics regulations prohibited

18

employees from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law." (A. 766 (Tr. 1929-30); A. 2042-50 (GX 1222); A. 2571 (GX 2206); A. 2602-06 (DX 9)). This policy made clear that information learned in the course of CMS employment, such as "an announced change in CMS payment or coverage policy," could be "'market sensitive' information, meaning that its disclosure may have stock or bond market implications." (A. 2043 (GX 1222)).

Second, multiple CMS witnesses testified to the importance that predecisional information concerning proposed reimbursement rate rules remain strictly confidential until released to the public. (A. 467, 470, 504, 764, 766, 840 (Tr. 209-10, 222-23, 360-61, 1923-24, 1929-30, 2378-79)). For one thing, leaks can generate "suboptimal" healthcare policy by inviting early, unbalanced lobbying by interest groups to thwart what would otherwise be a cost-effective measure for delivering the highest level of healthcare. (A. 766-67 (Tr. 1932-33); *see also* A. 504 (Tr. 360-61); A. 840 (Tr. 2378-79); A. 2924 (GX 1705) (Blaszczak reporting to client that "[t]he theme of everything" at CMS is "cost savings and efficiency")). As Jonathan Blum, the Director of the Center for Medicare at CMS during the relevant period, testified at trial, keeping predecisional information confidential was key to developing and maintaining effective health care policy. (A. 464, 467 (Tr. 195-96, 209-210)). The "[d]ecisions CMS makes ha[ve] tremendous impact on the overall federal budget and the overall healthcare economy," so it is important to give all affected parties an equal opportunity to weigh in on the wisdom of a proposed rule or

19

policy change. (A. 470 (Tr. 223)). When information is instead selectively leaked, that "begins to trigger powerful forces to try and stop decisions," so that "when leaks happen[ed], my job became more tough and more difficult to manage the process flow and to convince my superiors of the right course for the Medicare program." (A. 467 (Tr. 210)). Another negative effect of leaking is that it can lead to "tighten[ing]" of CMS's internal information sharing process, which can, in turn, result in the agency making "mistakes" and "not fully vetting . . . [its] options" in connection with proposed rules. (A. 766 (Tr. 1932)).

As this Court previously noted, Blum testified that CMS has "'a very strong precedent and a very strong principle that every stakeholder has the right to receive the materials concerning a rule at the same time,' because the 'rule-making process is based upon the notion that the entire public that can be affected . . . has the right to comment' in a manner that is fair to all stakeholders." *Blaszczak*, 947 F.3d at 39 (quoting A. 467 (Tr. 209)). The evidence at trial established that the "leaking of predecisional information" could "tilt the playing field against interest groups (and the public) who were not yet privy to the information," as well as "spawn interference with CMS's processes." *Id.* at 39, 42. Although the Court cited this evidence in its discussion of § 641, it is equally probative here with respect to the issue of obstruction of a lawful government function under the defraud clause. Leaks that undermine the fairness of the rule-making process "seriously impair[]" public confidence in an agency's work, *see Peltz*, 433 F.2d at 52, and leaks that "spawn

20

interference with CMS's processes" quite literally impair, obstruct, or defeat a lawful agency function.

Third, the evidence at trial clearly established that Blaszczak, Huber, and Olan understood that their actions obstructed the lawful functions of CMS by compromising the confidentiality of the subject information and unfairly tilting the playing field to favor the recipients of the information, in contravention of CMS's regulatory mission. As Fogel, who had less experience than Blaszczak, Huber, and Olan with CMS and the health care industry generally, testified: "if the information was out there, it would give industry lobbyists and others a chance to combat [the agency's efforts] and stop a proposed cut or increase from happening." (A. 564 (Tr. 724)). Indeed, Fogel discussed this very issue with Huber and Olan. (A. 564 (Tr. 724)). And the email evidence confirms these defendants' understanding that nondisclosure of predecisional information was paramount to CMS's mission. (A. 2001 (GX 815) (Huber email reporting Blaszczak's admonition to not "bring too much att'n to reimb on VAR yet" because "otherwise the industry goes bananas and usually squashes changes")). *Cf. Blaszczak*, 947 F.3d at 41-42 (rejecting claims that Blaszczak, Huber, and Olan did not understand that their actions would seriously interfere with the work of CMS).

To be sure, it was the Government's burden to establish that Blaszczak, Huber, and Olan had the specific intent to obstruct CMS's functioning. *See United States v. Gurary*, 860 F.2d 521, 523 (2d Cir. 1988). But the Government did so by proving that the scheme would "defraud the United States by depriving it of its

21

lawful right and duty of promulgating or diffusing the [CMS] information so officially acquired in the way and at the time required by law or departmental regulation." *Haas*, 216 U.S. at 479-80. That a defendant's *motive* was to make money from information he misappropriated does not, as Huber and Olan suggest, defeat a finding of specific intent; if it did, then *Haas* and *Peltz* would have come out differently, for the motive in those cases, as here, was to trade on the stolen information for profit. *See id.* at 478; *Peltz*, 433 F.2d at 49-50; *see also United States v. Southland*, 760 F.2d 1366, 1373 (2d Cir. 1985) ("Section 371 has often been applied to reach conduct intended to defraud the United States, although the original activity was aimed at quite different objectives.").

Indeed, this Court has made clear that "intent to defraud the United States may be incidental to another primary motivation or purpose." *Gurary*, 860 F.2d at 525. In *Gurary*, the Court affirmed the conspiracy convictions of salesmen who had schemed to sell fictitious invoices that would permit the purchasing companies to misreport their taxable income to the IRS. *See id.* at 523. Although "[i]mpeding the IRS" was "not defendants' primary purpose," it was nonetheless "part and parcel of the scheme." *Id.* at 525. The same is true here; defendants' scheme could not succeed without the misappropriation of CMS's confidential information and its attendant risks to the agency's mission and processes. *See Southland Corp.*, 760 F.2d at 1373 ("[Defendants] cannot escape liability by showing that this intent [to defraud the United States] was merely incidental to some other action which constituted their primary motivation.").

22

The evidence at trial also overwhelmingly established the "deceitful or dishonest means" element of conspiracy to defraud the United States. As this Court has recognized, "[t]he very making of a plan whereby a government employee will divulge material information which he knows he should not is 'dishonest'" for purposes of a conspiracy to defraud the United States. *Peltz*, 433 F.2d at 52. Here, Blaszczak was paid by Huber and Olan (with respect to Count One) and Plaford (with respect to Count Seventeen) to get confidential CMS information they knew should have been kept within the agency to ensure a level regulatory playing field. (A. 547, 578, 587, 687, 880 (Tr. 647, 781-83, 818-19, 1452, 2551-52); SA 28, 48 (Tr. 1764, 3287-88)). And the episode with Dr. Niles Rosen illustrates that Blaszczak, Huber, and Olan knew this was information that CMS and its faithful employees and contractors would not simply give them upon the asking:

> Olan, Huber, Fogel, and Blaszczak attempted to extract predecisional CMS information from CMS consultant Dr. Niles Rosen, prompting an email discussion of the fact that Rosen was unlikely to disclose such information. Olan commented that he thought the odds of Blaszczak "getting shut down by Rosen were 103%," but nevertheless Blaszczak and the Deerfield partners pushed ahead in the hopes that Blaszczak might get Rosen to "bite," since he was "the man with the keys to the radiation-oncology device companies' coffins." Ultimately, Rosen rebuffed Blaszczak's efforts, writing in an email,

23

"As you clearly understand, I cannot share with you our recommendations to CMS."

*Blaszczak*, 947 F.3d at 41; *see also id.* at 28 (describing Plaford testimony that he "considered Blaszczak's CMS information to be 'much more accurate' than the information provided by other consultants, since it came 'directly from the horse's mouth,' meaning Blaszczak's friends and former colleagues at CMS" and that "Blaszczak told Plaford that he had a 'high conviction' that his information was accurate because he was 'interacting directly with his counterparties in CMS who were working on the rule, and they were telling him what the cut would be'"). Accordingly, Blaszczak, Huber, and Olan knew that deceitful means must be employed to obtain the information.

Finally, the defendants contend that the defraud clause should be construed narrowly to avoid vagueness and First Amendment concerns. (Blaszczak Br. 65; Huber Br. 58-59; Olan Br. 52-53). But there is no reason to believe that the Supreme Court's longstanding construction of the defraud clause is beyond the ability of "ordinary people [to] understand." *Skilling*, 561 U.S. at 402. Furthermore, the defraud clause is an anti-fraud statute that requires proof of deceitful or dishonest means, and it is well established that "the First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 US 600, 612 (2003). In any event, this Court has repeatedly rejected "similar attempt[s] to invoke" constitutional concerns "to 'pare the body of § 371 precedent down to its core,'" recognizing that it is "'bound

24

to follow' both 'the law of the Circuit' and 'long-lived Supreme Court decisions' that have definitively adopted and reaffirmed the 'expansive reading of § 371' given by courts." *Atilla*, 966 F.3d at 131 (quoting *Coplan*, 703 F.3d at 61-62).

Because the overwhelming evidence presented at trial establishes beyond a reasonable doubt that Blaszczak, Huber, and Olan conspired to defraud the United States, the *Yates* errors were harmless. *See Skilling*, 561 U.S. at 414.[7] Accordingly, the convictions on Counts One and Seventeen should be affirmed, and

---

[7] Worrall's acquittal on Count One does not alter this conclusion, as the evidence against Blaszczak, Huber, and Olan was stronger than the evidence against Worrall. Fogel testified directly to the understandings of Huber, Olan, and Blaszczak about the importance of proposed rate changes to CMS and its mission, and that testimony was corroborated by emails with Huber and Olan about the same topic. In contrast, Fogel did not have any direct contact with Worrall or testify about him; nor were there any emails between Worrall and his co-defendants about the interference with CMS's mission. In addition, Blaszczak, Huber, and Olan attempted to obtain confidential CMS information from Rosen about CMS's reimbursement rates for genetic testing, an incident that did not involve Worrall. Furthermore, the Government argued in summation that Blaszczak had sources of inside information at CMS other than Worrall. (*See* A. 1027 (Tr. 3899) (arguing in rebuttal summation that Blaszczak had multiple sources at CMS)).

25

the case remanded for resentencing as to Blaszczak, Huber, and Olan.

## CONCLUSION

**The convictions on Counts Two, Three, Nine, Ten, Thirteen, Fifteen, Sixteen, and Eighteen should be reversed; the convictions on Counts One and Seventeen should be affirmed; and the case should be remanded for resentencing as to Blaszczak, Huber, and Olan.**

Dated:    New York, New York
          April 2, 2021

                    Respectfully submitted,

                    AUDREY STRAUSS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                         *of America.*

IAN MCGINLEY,
JOSHUA A. NAFTALIS,
WON S. SHIN,
     *Assistant United States Attorneys,*
          *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with this Court's January 29, 2021 order limiting the principal briefs on remand to 25 pages.

AUDREY STRAUSS,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*